JEFFERSON COUNTY, A political subdivision of the State of Alabama, Plaintiff-Appellant,

v.

William ACKER, Jr., Defendant-Appellee.

Jefferson County, A political subdivision of the State of Alabama, Plaintiff-Appellant,

v.

U.W. Clemon, Defendant-Appellee.

No. 94-6400.

United States Court of Appeals,

Eleventh Circuit.

April 26, 2000.

Appeal from the United States District Court for the Northern District of Alabama. (Nos CV93-M-69-S and CV93-M-196-S), Charles A. Moye, Jr., Judge.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before CARNES, BARKETT and WILSON, Circuit Judges.

CARNES, Circuit Judge:

For more than seven years the validity of the occupational tax imposed by Jefferson County, Alabama Ordinance 1120 (Sept. 29, 1987), as it applies to the district court judges of the United States District Court for the Northern District of Alabama, has been litigated in federal court. *See Jefferson County v. Acker,* 850 F.Supp. 1536 (N.D.Ala.1994), *rev'd,* 61 F.3d 848 (11th Cir.1995), *aff'd en banc,* 92 F.3d 1561 (11th Cir.1996), *vacated,* 520 U.S. 1261, 117 S.Ct. 2429, 138 L.Ed.2d 191 (1997), *aff'd en banc,* 137 F.3d 1314 (11th Cir.1998), *rev'd,* 527 U.S. 423, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999). The matter is once more back before us, again on remand from the Supreme Court, *see* 527 U.S. 423, 119 S.Ct. 2069, 2081, 144 L.Ed.2d 408, this time for what may be the last chapter in the story, at least as far as the storyline involves federal court litigation over the occupational tax.[1]

---

[1] We are informed by the parties that the ordinance imposing the occupational tax has spawned litigation in state court involving challenges to it on other grounds, and more than one piece of legislation has been

The issue that remains for us to address is whether application of this occupational tax to Article III judges violates the Compensation Clause, which is contained in Article III, Section 1 of the Constitution. *See* 119 S.Ct. at 2074 n. 2 (noting that we had not yet addressed the issue of whether the tax violated the Compensation Clause, and that the issue was not before the Supreme Court). The district court held that application of the tax to the Appellees, both of whom had been appointed judge before enactment of the ordinance imposing the tax, violated the Compensation Clause. *See* 850 F.Supp. at 1546-48. We reach a different conclusion.

The Compensation Clause, sometimes called the Anti-Diminution Clause, provides that Article III judges, "shall at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const. art. III, § 1. The Jefferson County occupational tax "is, and operates as, a tax on employees' compensation." *Jefferson County, Alabama v. Acker,* 119 S.Ct. at 2077. The Supreme Court held in *Evans v. Gore,* 253 U.S. 245, 264, 40 S.Ct. 550, 557, 64 L.Ed. 887 (1920), that an income tax on the compensation of Article III judges was unconstitutional, but the holding of that decision is limited to application of an income tax to judges appointed before the tax was enacted (and as we will discuss shortly, before the legislature was clearly authorized to enact the tax), which is as far as the facts of that case went, *see id.* at 246, 40 S.Ct. at 550. That limitation of the *Evans* decision was confirmed and arguably tightened in *O'Malley v. Woodrough,* 307 U.S. 277, 59 S.Ct. 838, 83 L.Ed. 1289 (1939).

introduced to revise or replace the tax (one bill was actually enacted but it was struck down on unrelated state constitutional grounds).

Appellees' moved for a stay of proceedings in this Court until the dust settles in the state court and legislative arena, but we denied that motion because "there does not appear to be a reasonable probability that the issue of the Appellees' liability for payment of the tax for past years will be mooted by any of the pending state judicial proceedings or by any action of the Alabama Legislature." Order Denying Motion to Stay Proceedings, February 22, 2000, Case No. 94-6400 (11th Cir.). In any event, this case is not moot as matters now stand.

Of course, we decide only the case before us, and nothing we say in this opinion is meant to imply any view on any other issues relating to the Jefferson County occupational tax.

2

The issue in *O'Malley* was whether Congress had transgressed the Compensation Clause by providing in a series of revenue acts that the income tax would be applicable to all federal judges appointed after the initial date of that provision's enactment. *See id.* at 278, 59 S.Ct. at 838; *id.* at 283-84, 59 S.Ct. at 840. The Supreme Court held that application of the income tax to Article III judges who were on notice when they were appointed that the tax would be applied to them did not violate the Compensation Clause. *See id.* The Court explicitly disavowed most of what it had said in *Miles v. Graham,* 268 U.S. 501, 45 S.Ct. 601, 69 L.Ed. 1067 (1925), a decision which had extended *Evans* to Article III judges appointed after the effective date the income tax was enacted. *See* 307 U.S. at 282-83, 59 S.Ct. 838 ("to the extent that what the Court now says is inconsistent with what was said in *Miles v. Graham,* 268 U.S. 501, 45 S.Ct. 601, 69 L.Ed. 1067, the latter cannot survive.").

The Supreme Court had much to say in its *O'Malley* opinion about the *Evans* decision, and none of it was flattering. The Court said that "the meaning which *Evans v. Gore, supra,* imputed to the history which explains Article III, § 1 was contrary to the way in which it was read by other English-speaking courts," 307 U.S. at 281, 59 S.Ct. at 839(footnote omitted); observed that *Evans* had "met wide and steadily growing disfavor from legal scholarship and professional opinion"; *id.,* and noted that the decision had been "rejected by most of the courts before whom the matter came after that decision." *Id.* (footnote omitted).

The Supreme Court also spoke disparagingly in *O'Malley* of the reasoning of *Evans,* although the Court arguably limited some of that disparagement to the facts before it in the *O'Malley* case. The Court declared that even to suggest an income tax would undermine the independence of federal judges appointed after Congress had put them on notice they would have to "bear their aliquot share of the cost of maintaining the Government, is to trivialize the great historic experience on which the framers based the safeguards of Article III, § 1." *Id.* at 282, 59 S.Ct. at 840 (footnote omitted). And, the Court reasoned that, "[t]o subject them to a general tax is merely to recognize that judges are also citizens, and that their particular function in government does not generate an immunity from sharing with their fellow citizens the material burden of the

3

government whose Constitution and laws they are charged with administering." *Id.* That reasoning about the permissibility of subjecting judges to general taxes is inconsistent with the reasoning and decision in *Evans*.

The Supreme Court recognized as much in *United States v. Will,* 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980), which involved Congressional action to stop or reduce previously authorized annual cost-of-living increases for certain federal officials including judges. In the course of deciding that case, the Court had this to say about the effect of *O'Malley* on *Evans:*

> In *O'Malley v. Woodrough,* 307 U.S. 277, 59 S.Ct. 838, 83 L.Ed. 1289 (1939), this Court held that the immunity in the Compensation Clause would not extend to exempting judges from paying taxes, a duty shared by all citizens. The Court thus recognized that the Compensation Clause does not forbid everything that might adversely affect judges. The opinion concluded by saying that to the extent *Miles v. Graham,* 268 U.S. 501, 45 S.Ct. 601, 69 L.Ed. 1067 (1925), was inconsistent, it "cannot survive." 307 U.S., at 282-283, 59 S.Ct., at 840. Because *Miles* relied on *Evans v. Gore,* *O'Malley* must also be read to undermine the reasoning of *Evans,* on which the District Court relied in reaching its decision.

*Will,* 449 U.S. at 227 n. 31, 101 S.Ct. at 486 n. 31. So, in *Will* the Supreme Court itself read *O'Malley* as undermining the reasoning of *Evans,* and it characterized the holding of *O'Malley* broadly, saying that the Compensation Clause did not exempt judges from paying the same taxes that other citizens paid.

Admittedly, in *Will* the Supreme Court did not use the magic word "overruled" in talking about *Evans,* but the Court came as close to overruling that earlier decision as it could without actually uttering the word. Given the severity of the blows *O'Malley* and *Will* inflicted upon *Evans* one might suggest it is time to recognize that *Evans* is dead and gone. *Cf. White v. Lemacks,* 183 F.3d 1253, 1259 (11th Cir.1999) ("Enough is enough. Like a favorite uncle who has passed away in the parlor, [our decision in] *Cornelius [v. Town of Highland Lake, Ala.,* 880 F.2d 348 (11th Cir.1989)]* needs to be interred. We do so now. Recognizing that it was dealt a fatal blow by [the Supreme Court's decision in] *Collins [v. City of Harker Heights, Texas,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)],* we pronounce *Cornelius* dead and buried."). The problem is that the Supreme Court has insisted on reserving to itself the task of burying its own decisions. We have been told more than once by it that, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of

4

Appeals should follow the case which directly controls, leaving to this Court, the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/ American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989); *accord, e.g., Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997) ("We do not acknowledge, and we do not hold that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."). We have followed that admonition. *See Brisentine v. Stone & Webster Engineering Corp.,* 117 F.3d 519, 525 (11th Cir.1997)("It may be that the Supreme Court has cut *Alexander [v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)]* back so far that it will not survive. Perhaps, but we are not convinced we are authorized to sing the dirge of *Alexander.* We will leave that to the Supreme Court, which has admonished courts of appeals ... '[to leave it] the prerogative of overruling its own decisions.' ") (quoting *Rodriguez de Quijas,* 490 U.S. at 484, 109 S.Ct. at 1921-22); *Engineering Contractors Ass'n v. Metropolitan Dade County,* 122 F.3d 895, 908 (11th Cir.1997).

There is, however, a difference between following a precedent and extending a precedent. That difference, as it relates to a lower court's duty to follow moribund Supreme Court decisions, is manifest in the words "which directly controls," the limiting phrase the Court used in *Rodriguez,* 490 U.S. at 484, 109 S.Ct. at 1921, to express our duty to follow one of its decisions whose reasoning has been undermined by later decisions. Where a Supreme Court decision that has not been overruled is squarely on point and therefore "directly controls" the case at hand, we are to follow it even though convinced that the Court will overturn that decision the next time it addresses the issue. But if the facts of a gravely wounded Supreme Court decision do not line up closely with the facts before us—if it cannot be said that decision "directly controls" our case—then, we are free to apply the reasoning in later Supreme Court decisions to the case at hand. We are not obligated to extend by even a micron a Supreme Court decision which that Court itself has discredited. Sometimes, perhaps oftentimes, the correct course will be illuminated by our attempt to reconcile the later Supreme Court decision with the earlier one, an attempt we are obligated to make. *Cf. United States v.*

5

*Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993)("A panel of this Court is obligated, if at all possible, to distill from apparently conflicting prior panel decisions a basis of reconciliation and to apply that reconciled rule.").

The *Evans* decision "directly controls" the case in which federal judges appointed before the federal income tax was even authorized are subjected to it. Recall that the plaintiff in *Evans* was appointed in 1899, 253 U.S. at 246, 40 S.Ct. at 550, four years after the Supreme Court had struck down as unconstitutional a prior federal income tax, *see Pollock v. Farmers' Loan & Trust Co.,* 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108 (1895). At the time of his appointment, not only was there no income tax on the books, it would be another fourteen years before the Sixteenth Amendment was ratified in 1913, authorizing Congress to "lay and collect taxes on incomes, from whatever source derived ..."[2] That is the context in which the *Evans* Court said that the "necessary operation and effect" of applying the income tax to the judge plaintiff in that case would be to "withhold or take from the judge a part of that which was promised by law for his services...." 253 U.S. at 254, 40 S.Ct. at 553. The Supreme Court has extended the holding of *Evans* beyond its facts only once, and that was in *Miles v. Graham,* which *O'Malley* explicitly overruled, 307 U.S. at 282-83, 59 S.Ct. at 840 (saying that *Miles* "cannot survive").

The judge plaintiff in *O'Malley* was appointed in 1933, after the Sixteenth Amendment was ratified, and after enactment of the legislation making the challenged tax applicable to federal judges. 307 U.S. at 279, 59 S.Ct. at 838. The *Evans* and *O'Malley* decisions are reconcilable, if at all, on the basis of the nature and amount of notice the plaintiff had at the time of appointment that his compensation could be subject to the tax in question. In *O'Malley* the judge had reasonable notice at the time of appointment that his compensation would be—or might be, since there was no certainty in those early days the tax would not be repealed—subject to the federal income tax. *See* 307 U.S. at 279, 59 S.Ct. at 838-39 ("For it was the Act of

---

[2]The income tax acts of 1913, chapter 16, 38 Stat. 168, 1916, chapter 463, 39 Stat. 758, and 1917, chapter 63, 40 Stat. 329, excluded the compensation of federal judges from the tax. *Evans,* 253 U.S. at 259, 40 S.Ct. at 555. The 1919 act, which was involved in the *Evans* case, explicitly included the compensation of "the judges of the Supreme and inferior courts of the United States." Comp. St. Ann. Supp.1919, § 6336; *Evans,* 253 U.S. at 246, 40 S.Ct. at 550.

6

June 6, 1932 [which, like other income tax legislation, was authorized by the Sixteenth Amendment] that gave notice to all judges thereafter to be appointed, of the new Congressional policy to include the judicial salaries of such judges in the assessment of income taxes.")  By contrast, the judge plaintiff in *Evans* did not have reasonable notice at the time of his appointment that his compensation might be subject to a federal income tax, because an attempt to levy a broad income tax previously had been struck down, and the constitutional amendment superceding that decision had not yet been adopted at the time the judge was appointed. Although Congress probably could have enacted an income tax limited to salary and compensation without the specific authorization of the Sixteenth Amendment, *see Pollock,* 158 U.S. at 636-37, 15 S.Ct. at 920, it was most unlikely to do so, *id.* ("We cannot believe that such was the intention of Congress."), and indeed did not.

The facts of the present case are not directly controlled by *Evans.*  It is true that the occupational tax at issue here was not enacted until after these two plaintiff judges were appointed to office:  one was appointed in 1980, the other in 1982, and the ordinance imposing the tax was enacted in 1988.  But at the time these judge plaintiffs were appointed, Alabama Act 406, which had been on the books since 1967, specifically authorized "Jefferson County to impose a privilege, license, or occupational tax upon all persons engaged in any vocation, occupation, calling, or profession who are not required by state law to pay such a tax to the State of Alabama." *See Jefferson County v. Acker,* 850 F.Supp. 1536, 1538 (N.D.Ala.1994).  Whatever may happen to that Alabama law in the future, at the time these judges were appointed, it put them on clear notice that under Alabama law they could be subjected by Jefferson County to a tax on their compensation.  Federal law was clear about that, too.  The Public Salary Tax Act of 1937,[3] 4 U.S.C. § 111, and the Buck Act, 4

---

[3]The Public Salary Tax Act, 4 U.S.C. § 111, states:

> The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the

U.S.C. § 106,[4] which was enacted in 1939, put federal judges on notice that their compensation was subject to a non-discriminatory state or local tax on compensation, which is what Jefferson County's occupational tax is, *see* 119 S.Ct. at 2080-81. The joint effect of Alabama Act 406, the Public Salary Tax Act, and the Buck Act, was to hang over the compensation of federal judges working in Jefferson County a sword of Damocles (or given that the tax rate ultimately imposed was only one-half of one percent, perhaps we should refer to it as a pen knife of Damocles). True, the blade did not fall until years later, but it hung there nonetheless at the time these two judges were appointed. That is notice enough for the tax to escape the weakened grasp of the *Evans* decision. To hold otherwise would require us to extend *Evans,* and that we will not do.[5]

The judgment of the district court is REVERSED, and this case is REMANDED for proceedings consistent with this opinion.

---

        pay or compensation.

   [4]The Buck Act, 4 U.S.C. § 106(a) states:

       No person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, by reason of his residing within a Federal area or receiving income from transactions occurring or services performed in such area; and such State or taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area.

   [5]The decision in *Hatter v. United States,* 64 F.3d 647 (Fed.Cir.1995), is not binding on us, and to the extent that its reasoning or result is inconsistent with our own, we are unpersuaded by it.

       Because of our disposition of the case on other grounds, we need not and do not reach Jefferson County's alternative argument that the Compensation Clause does not apply to state and local legislative measures anyway.